**CASCADIA WILDLANDS PROJECT, an Oregon nonprofit corporation, Oregon Natural Resources Council Fund, an Oregon nonprofit corporation, League of Wilderness Defenders—Blue Mountains Biodiversity Project, an Oregon nonprofit corporation, and the Sierra Club, a California nonprofit corporation, Plaintiffs,**

v.

**UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture, and Leslie Weldon, in her official capacity as Deschutes National Forest Supervisor, Defendants.**

No. Civ. 05–76–JE.

United States District Court, D. Oregon.

Aug. 12, 2005.

Chris Winter, Ralph O. Bloemers, James D. Brown, Cascade Resources Advocacy Group, Susan Jane Brown, Portland, OR, for Plaintiffs.

Karin J. Immergut, United States Attorney, District of Oregon, Jeffrey K. Handy, Assistant United States Attorney, Portland, OR, Kelly A. Johnson, Acting Assistant Attorney General, Barclay T. Samford, U.S. Department of Justice, Environment & Natural Resources Division, Denver, CO, for Defendants.

## OPINION AND ORDER

KING, District Judge.

The Honorable John Jelderks, United States Magistrate Judge, filed Findings and Recommendation on July 13, 2005. Plaintiffs filed timely objections to the Findings and Recommendation. When either party objects to any portion of a magistrate's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the magistrate's report. 28 U.S.C. § 636(b)(1); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.*, 656 F.2d 1309, 1313 (9th Cir.1981), *cert. denied*, 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). The matter is before this court pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b).

This court has, therefore, given *de novo* review of the rulings of Magistrate Judge Jelderks. I decline to make a determination of whether to adopt the finding that any claim based upon the superseded 1982 regulations of alleged failure to comply with requirements to monitor MIS by obtaining quantitative population data is now moot because the 2005 regulations should be applied retroactively. I decline to make this determination because I agree with and adopt the finding that the Forest Service's determination that the Eyerly Project complied with the 1982 regulations was not arbitrary or capricious or contrary to law. Thus, I grant summary judgment against plaintiffs' first claim under NFMA.

■ I also acknowledge plaintiffs' objection that the Findings and Recommendation fails to address their argument that the administrative record does not support the finding that reliance on DecAID complies with the scientific integrity requirement of NEPA. I have considered this argument myself and conclude that NEPA is not violated in this respect.

Accordingly, this court ADOPTS the remaining portions of the Findings and Recommendation of Magistrate Judge Jelderks dated July 13, 2005 in its entirety.

IT IS HEREBY ORDERED that Plaintiffs' Motion to Strike the Declaration of Kim Mellen and alternative Motion for an Evidentiary Hearing (# 33) is denied, Plaintiffs' Motion for Summary Judgment (# 16) is denied, and Defendants' Motion for Summary Judgment (# 20) is granted. The Temporary Restraining Order I entered on August 3, 2005 is lifted immediately. This action is dismissed with prejudice.

### FINDINGS AND RECOMMENDATION/ORDER

JELDERKS, United States Magistrate Judge.

Plaintiffs Cascadia Wildlands Project, the Natural Resources Council Fund, the League of Wilderness Defenders—Blue Mountains Biodiversity Project, and the Sierra Club bring this action against the United States Forest Service (Forest Service) and Leslie Weldon, Deschutes National Forest Supervisor. Plaintiffs seek administrative review, pursuant to the Administrative Procedure Act (APA) 5 U.S.C. §§ 701–706, of defendants' decision to authorize commercial salvage logging as part of the Eyerly Fire Salvage Logging Project (Eyerly Project) on the Deschutes National Forest in the Sisters Ranger District. Plaintiffs seek injunctive and declaratory relief.

The parties have filed cross motions for summary judgment. Also pending are plaintiffs' motion to strike the declaration of Kim Mellen, and alternative motion for an evidentiary hearing concerning that motion.

I deny the motion to strike Ms. Mellen's declaration and alternative motion for an evidentiary hearing. Defendants' motion for summary judgment should be granted, and plaintiffs' motion for summary judgment should be denied.

### BACKGROUND

On July 9, 2002, lightning started a fire on the north side of the Metolius arm of lake Billy Chinook in the Warm Springs Reservation. The fire, which was named the Eyerly Fire, spread into the Sisters Ranger District of the Deschutes National Forest on July 11, 2002, and covered 23,-134 acres before it was contained on July 26, 2002. The Fire burned 17,786 acres within the Deschutes National Forest.

Much of the Eyerly Fire burned within Late Successional Reserves (LSR), the Metolius Wildlife/Primitive Management Area, and the Old Growth Management Area of the Deschutes National Forest Land and Resource Management Plan (LRMP).

In its effort to suppress the Eyerly Fire, the Forest Service opened closed roads, developed other roads, and established safety zones, helispots, and portable fire retardant plants. Approximately 406,551 gallons of fire retardant were dumped on the fire, and a concentrated retardant spill into Street Creek occurred on July 22, 2002. Much of the approximately 84 miles of firelines established during the fire was built by bulldozer.

The Forest Service developed a fire salvage management project for the area in the National Forest covered by the Eyerly

Fire. The project, referred to by the parties as the "Eyerly Project," listed the following five post-fire management goals: (1) recovering the economic value of the trees that were killed by or expected to die as a result of the Fire; (2) reducing future fuel loading to be consistent with management direction; (3) accelerating the reestablishment of upland forest vegetation; (4) reducing the public safety hazard posed by dead trees along major roads and in campgrounds; and (5) designating substitute old growth areas for the old growth areas that were destroyed by the fire.

On December 5, 2003, the Forest Service issued a Draft Environmental Impact Statement (DEIS) for the Eyerly Project Area. The Forest Service issued a Final Environmental Impact Statement (FEIS) for the area on July 2, 2004. The FEIS considered a "no-action alternative" and two "action alternatives," in detail, and identified Alternative 2 as the environmentally-preferred alternative. On August 2, 2004, defendant Weldon signed a Record of Decision (ROD) adopting Alternative 2.

The Eyerly Project, which reflects Alternative 2, specifies the following activities:

1. *Salvage Harvest:* The Eyerly Project includes plans for harvesting dead and dying trees on approximately 3,420 acres and harvesting only dead trees on 1,426 acres within the Metolius Late Successional Reserve (LSR).

2. *Hazard Tree Removal:* Dead or dying trees that pose a hazard to human life and property are to be removed within two campgrounds and along the haul routes to be used for the salvage operations.

3. *Road Work:* The Project includes plans for construction of 2.1 miles of temporary roads which are to decommissioned following salvage operations, reconstruction of 33.4 miles of existing roads, and decommissioning of 3.8 miles of existing roads.

4. *Fuels Treatment:* The Project includes plans for removal of fuel, including slash generated during salvage harvesting, to reduce the amount of fuel available for future fires.

5. *Reforestation:* Under the Project, 3,918 acres in which the fire damage was particularly severe would be reforested to provide habitat for wildlife.

6. *Old Growth:* The Project provides for replacement of two old growth habitat areas which were destroyed by the Eyerly Fire with newly designated old growth management areas.

On January 5, 2005, the Forest Service promulgated new regulations to replace regulations that were previously set out at 36 C.F.R. Part 219.

The FEIS for the Eyerly Project includes an evaluation of the Project's impact on the viability of 15 Management Indicator Species (MIS) of birds and four MIS species of mammals. The parties disagree as to whether the FEIS includes an adequate discussion of the viability of the 15 bird MIS populations, and whether the Forest Service properly evaluated population viability, but agree that the Forest Service identified seven "primary cavity excavator" (PCE) birds as MIS which occupied habitat in the Project Area. They also agree that the FEIS compares the amount of PCE snag habitat for each PCE species under all three of the specified alternatives, but disagree as to the method the Forest Service employed to project available PCE snag habitat. The Forest Service asserts that it "projected available PCE snag habitat based on a district-wide photo database, physical stand exams, burn intensity from post-fire satellite change detection, and district-wide snag inventory data." Plaintiffs contend that the Forest Service in fact "relied primarily

upon DecAID [The Decayed Wood Advisory for Managing Snags, Partially Dead Trees, and Down Wood for Biodiversity in Forests of Washington and Oregon] to determine available snag density and also to predict future snag densities across the landscape."

The Forest Service concluded that the levels of snag retention in the Eyerly Project area meet or exceed the requirements set out in the forest plan, and that the proposed salvage harvest in the Metolius Late Successional Reserve set out in the Project is consistent with the Northwest Forest Plan. The inter-agency Regional Ecosystem Office (REO) also reviewed the Eyerly Project, and found that it was "consistent with the Northwest Forest Plan."

The parties disagree as to whether the Forest Service considered a "restoration-only" alternative which would not have included plans for any logging in the burned area. The Forest Service asserts that it considered and rejected that alternative because it would not have realized any economic value from the trees that were killed or damaged by the fire. Plaintiffs assert that the Forest Service "eliminated [the restoration-only] alternative from adequate consideration and public review."

The parties also disagree as to whether the EIS for the Eyerly Project addresses the cumulative impacts of the Project on water quality, wildlife, and soils, whether the Forest Service concluded that the Project is consistent with Forest Plan standards and guidelines for soils, and whether the Forest Service's determination that salvage logging of 977 acres of burned timber in the Metolius Wildlife/Primitive Area was consistent with the Deschutes Forest Plan was legally or factually adequate. Plaintiffs assert that the Forest Service "specifically concluded that salvage logging ... within the Metolius Wildlife Primitive Area would degrade habitat for species that depend on older, more mature forests with a closed canopy."

The parties also disagree as to whether the Forest Service properly considered the effect of salvage logging on the Eyerly Project in conjunction with other post-fire logging sales on the Deschutes National Forest, and whether the Forest Service considered the cumulative effects of salvage logging on the Eyerly Project and logging on private and tribal lands burned in the Eyerly Fire. Plaintiffs assert that the Forest Service's plans to salvage log more than 11,000 acres "in the vicinity of the Eyerly planning area," and that defendants have not disclosed "whether the 11,-000 + acres of salvage logging would have a cumulative impact on wildlife habitat in conjunction with the Eyerly Fire Salvage." Plaintiff's Concise Statement of Material Facts, p. 5. Defendants contend that the other projects referred to which include plans for salvage logging are not in the vicinity of the Eyerly Project, but instead are many miles away, and assert that the EIS prepared by the Forest Service reasonably evaluated all the cumulative impacts.

## PLAINTIFFS' CLAIMS

Plaintiffs bring six claims. The first claim alleges that the Forest Service violated the National Forest Management Act (NFMA), 16 U.S.C. § 1600 *et seq.*, by failing to ensure the viability of populations of management indicator species.

The second claim alleges that the Forest Service's authorization of "extensive" logging in the Late–Successional Reserve violates the NFMA.

The third claim alleges that the Forest Service violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4361, by failing to consider a "restoration-only" alternative for the Eyerly Project.

The fourth claim alleges that the EIS prepared for the Eyerly Salvage Project violates NEPA by failing to adequately assess the projects direct, indirect, and cumulative impacts.

The fifth claim alleges that the Eyerly Salvage Project violates the NFMA by failing to comply with Forest Plan standards and guidelines designed to protect soils.

The sixth claim alleges that the Forest Service's authorization of salvage logging in the Metolius Wildlife Primitive Area violates the NFMA.

Plaintiffs seek declaratory relief consistent with these claims and an injunction prohibiting defendants from taking "any further action to proceed in connection with the Eyerly Salvage Logging project, or within the Eyerly Salvage logging area ... until ... defendants have adequately analyzed and disclosed all direct, indirect and cumulative environmental impacts in a legally sufficient environmental analysis, and can demonstrate full compliance with all applicable provisions of NFMA, NEPA, and the APA."

## PENDING MOTIONS

I. *Motion to strike Mellen's declaration; alternative motion for evidentiary hearing*

The Forest Service's use of the DecAID database in development of the Eyerly Project is a significant issue in this litigation. In support of their response to plaintiffs' motion for summary judgment, defendants submitted the declaration of Kim Mellen. Mellen, the Regional Wildlife Ecologist for the Pacific Northwest Region of the Forest Service, was the lead author of the DecAID program. In her declaration, Mellen explained certain aspects of the DecAID program, and addressed certain technical criticisms of the program raised in plaintiffs' supporting memorandum.

Plaintiffs move to strike Mellen's declaration on the grounds that it includes information outside the record which the court does not need to decide the issues raised in this action. They assert that, with this declaration, the Forest Service "has improperly attempted to pack the record with expert opinion that was not disclosed to the public or included in the Administrative Record at the time the agency made its decision."

■■ I disagree. As all the parties correctly acknowledge, judicial review of an administrative agency's final action is generally limited to examination of the administrative record as it existed when the agency made the relevant decision, *e.g., Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 560 (9th Cir.2000), and an agency cannot rely on "post hoc rationalizations" to defend its earlier decisions. *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). However, material outside the record may be considered when it is needed to explain "technical terms or complex subject matter." *Southwest Center For Biological Diversity v. United States Forest Service,* 100 F.3d 1443, 1450 (9th Cir.1996) (*quoting Inland Empire Public Lands Council v. Glickman,* 88 F.3d 697, 703–04 (9th Cir.1996)).

The DecAID program is a complex and technical tool that the Forest Service used in the analysis underlying the Eyerly Project. Mellen's declaration explains certain technical aspects of the DecAID database and its use, and addresses criticisms of the program. These explanations do not constitute impermissible "post-hoc rationalization" for the conclusions reflected in the Eyerly Project, but instead simply help the court understand the DecAID database and its use. Mellen's explanations help the court understand the process by which the Forest Service developed the

Eyerly Project and the kind of data included in the database. Mellen's declaration helps explain material in the administrative record under review. This is a permissible use, and the motion to strike Mellen's declaration is denied. Because the issues plaintiffs have raised concerning the DecAID database can be understood and resolved without further evidence, plaintiffs' alternative motion for an evidentiary hearing is also denied.

## II. *Cross Motions for Summary Judgment*

### A. *Requirements of the NFMA and NEPA*

#### 1. *The NFMA*

Under the NFMA, National Forests are required to develop comprehensive forest management plans, called "Land and Resource Management Plans" (LRMPs). 16 U.S.C. § 1604. These plans set out broad planning goals and objectives for individual units of the National Forest System, and establish specific standards and guidelines for managing forest resources. 16 U.S.C. § 1604(g)(1)-(3). The NFMA requires that LRMPs provide for multiple uses of the forest and "comply with substantive requirements of the Forest Act designed to ensure continued diversity of plant and animal communities and continued viability of wildlife in the forest. . . ." *Idaho Sporting Congress, Inc. v. Rittenhouse,* 305 F.3d 957, 961 (9th Cir.2002) (*citing* 16 U.S.C. § 1604(g)(3)(B); 36 C.F.R. § 219.19).

Individual site-specific projects developed by the Forest Service must be consistent with the relevant LRMP, must comply with NEPA if that Act applies, and must be specifically approved by the appropriate Forest Service official. *See* 16 U.S.C. § 1604(I), *Inland Empire Public Lands Council v. United States Forest Service,* 88 F.3d 754, 757 (9th Cir.1996). Site-specific projects must also comply with the

NFMA. *Idaho Sporting Congress,* 305 F.3d at 962.

In 1994, the Northwest Forest Plan (NFP) amended the LRMP for the Deschutes National Forest. Administrative Record (AR) at 00256. Under the NFP, late-successional reserves (LSRs) "are to be managed to protect and enhance conditions of late-successional and old-growth forest ecosystems, which serve as habitat for late-successional and old growth related species including the northern spotted owl." AR at 00381.

#### 2. *NEPA*

█ NEPA imposes procedural requirements on agency decisions that affect the natural environment. 42 U.S.C. § 4321. NEPA requirements are procedural rather than substantive, and are intended to insure that agency decisions to which the Act applies are "fully informed and well-considered. . . ." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). In reviewing NEPA compliance, the question is generally whether "the agency observed the appropriate procedural requirements." *Northcoast Environmental Center v. Glickman,* 136 F.3d 660, 665 (9th Cir. 1998).

NEPA requires federal agencies to prepare a detailed Environmental Impact Statement (EIS) for "major Federal actions significantly affecting the quality of the human environment. . . ." 42 U.S.C. § 4332(2)(C). An agency first prepares a draft EIS evaluating the proposed action, reasonable alternatives, and a "no action" alternative, which is circulated for public review and comment. 40 C.F.R. §§ 1502.19; 1503.1. After reviewing these comments, the agency responds, makes comments, and circulates a final EIS. 40 C.F.R. § 1503.4. The agency's Record of

Decision (ROD) must identify the environmentally preferable alternative, 40 C.F.R. § 1505.2(b), but the agency is not required to chose that alternative if, after adequately identifying and evaluating the adverse effects of the proposed action, it concludes that "other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

■■ A court's review of an EIS under NEPA is "extremely limited." *National Parks & Conservation Ass'n v. United States Dept. of Transp.,* 222 F.3d 677, 680 (9th Cir.2000). An EIS is legally sufficient if it " 'contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences' " of the action in question. *Id.* (*quoting Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 492 (9th Cir.1987)). Reviewing courts accord substantial deference to an agency's scientific methodology. *Gifford Pinchot Task Force v. United States Fish & Wildlife Service,* 378 F.3d 1059, 1066 (9th Cir.2004) (*citing United States v. Alpine Land and Reservoir Co.,* 887 F.2d 207, 213 (9th Cir.1989)). The court must approve the EIS in question if it is "satisfied that the EIS process fostered informed decision-making and public participation." *National Parks,* 222 F.3d at 680 (*citing Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir. 1992)). If the court determines that the agency took a "hard look" at the environmental consequences of the project in question, "review is at an end." *Id.* (citation omitted).

### B. *Standard of Review under APA*

■■ Claims brought pursuant to the NFMA and NEPA are reviewed under the standards set out in the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. *See Idaho Sporting Congress,* 305 F.3d at 964 (claims brought under NFMA

and NEPA reviewed under standards set out in APA). Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The court may not substitute its judgment for that of the agency, *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), or set aside the agency's decision simply because the court, as an original matter, might reach a different result. *See, Arizona Cattle Growers' Ass'n v. United States Fish and Wildlife,* 273 F.3d 1229, 1236 (9th Cir.2001).

■■ Review under the APA is limited to the administrative record that existed before the agency when the decision was made. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Where, as here, agency decisions are based upon expert analysis, the reviewing court does not "decide which party utilized the better methodology in conducting its … analysis," but instead "simply determine[s] whether the [agency's] choice of methodology had a rational basis, consistently applied, taking relevant considerations into account." *Druid Hills Civic Ass'n v. Federal Highway Admin.,* 772 F.2d 700, 709 (11th Cir.1985).

■■ Claims brought under the APA may be resolved through motions for summary judgment. *See, e.g., Northwest Motorcycle Ass'n v. United States Dept. of Agriculture,* 18 F.3d 1468, 1471–72 (9th Cir.1994) (applying summary judgment standards to review of agency action under APA).

### C. *Summary Judgment Standards*

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact

and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may discharge this burden by showing that there is an absence of evidence to support the nonmoving party's case. *Id.* When the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond the pleadings and show that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

▮ The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). Reasonable doubts concerning the existence of a factual issue should be resolved against the moving party. *Id.* at 630–31. The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1985). No genuine issue for trial exists, however, where the record as a whole could not lead the trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

D. *Analysis of Plaintiffs' Claims*

1. *Alleged Violation of NFMA and Deschutes LRMP by Failure to Ensure Viability of Populations of Management Indicator Species*

Plaintiffs' first claim alleges that the Forest Service failed to meet its obligation to gather quantitative data on the population levels of Management Indicator Species (MIS), and that the Forest Service used an inappropriate model to estimate the habitat requirements for MIS.

Defendants contend that these allegations are moot because the regulations upon which the claim is based are no longer in effect. In the alternative, defendants contend that the Eyerly Project complied with the regulations that were in effect when the Project was designed, that the Forest Service "appropriately used the Decayed Wood Advisor and Management Aid (DecAid)," and that the number of snags that will remain after the Project is completed will meet or exceed the levels required under the Deschutes Forest Plan.

As noted above, the NFMA requires the Forest Service to ensure continued diversity of plant and animal communities. 16 U.S.C. § 1604(g)(3)(B). Under regulations enacted in 1982, the Forest Service was required to identify and select MIS as part of its method for managing habitat to maintain viable species populations. *See* C.F.R. § 219.19(a)(1). According to these regulations, population trends of MIS were to be monitored because changes in MIS were considered as evidence of the effects of management activities on various species. *Id.;* 36 C.F.R. § 219(a)(6). However, in January 2005, the Forest Service promulgated new regulations that replaced the requirements formerly set out in 36 C.F.R. Part 219. 70 Fed.Reg. 1023 (Jan. 5, 2005) (repealing 1982 regulation); 70 Fed.Reg. 1023, 1055–61 (Jan. 5, 2005) (providing for codification of new regulations at 36 C.F.R. Part 219).

The new regulations, which took effect on January 5, 2005, specifically repealed all of the provisions of the 1982 regulations, including those regulations which plaintiffs contend required the Forest Service to collect quantitative population data for MIS in order to comply with the NFMA. The only duties concerning MIS that remain under the new regulations are those that are imposed under individual forest plans, and the Forest Service may comply

with these requirements by "considering data and analysis relating to habitat unless the plan specifically requires population monitoring or population surveys for the species." 36 C.F.R. § 219.14.

■ Defendants contend that any claim of alleged failure to comply with requirements to monitor MIS by obtaining quantitative population data that is based upon the superseded 1982 regulations is now moot. I agree. Article III of the United States Constitution allows Federal courts to adjudicate only "live cases or controversies." *Thomas v. Anchorage Equal Rights Com'n,* 220 F.3d 1134, 1138 (9th Cir.2000) (en banc). Whether an actual justiciable controversy exists is determined when the court acts, not when the action is commenced. *Bowen v. Kizer,* 485 U.S. 386, 387, 108 S.Ct. 1200, 99 L.Ed.2d 402 (1988) (per curium). Accordingly, a claim may become moot after an action is filed. *Id.*

If the new regulations which replaced the 1982 regulations are to be applied retroactively, plaintiffs' first claim is moot. The parties agree that the 2005 regulations do not explicitly state whether they are to be applied retroactively in place of the 1982 regulations.

■ When a statute does not explicitly state whether it is to be applied retroactively, courts' consider: (1) whether application of the new law would impair rights which a party possessed when the activity in question occurred; (2) whether application of the new law would increase a party's liability for past conduct; and (3) whether application of the new law would impose new duties as to transactions that were already completed. *Landgraf v. USI Film Products,* 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Courts have applied this same analysis to the question whether regulations apply retroactively. *See, e.g., National Mining Ass'n v. Department of Labor,* 292 F.3d 849, 859 (D.C.Cir.2002); *Association of Accredited Cosmetology Schools v. Alexander,* 979 F.2d 859, 864 (D.C.Cir.1992). Though there is generally a presumption against retroactivity, *Landgraf,* 511 U.S. at 273, 114 S.Ct. 1483, a party's "expectation of success in its litigation" is not the sort of expectation that is protected by that presumption. *Southwest Center for Biological Diversity v. United States Dept. of Agriculture,* 314 F.3d 1060, 1062 n. 1 (9th Cir.2002).

Applying the factors set out in *Landgraf* to the question of which regulations should apply here, I conclude that the 2005 regulations should be applied retroactively. Application of the new regulations would not impair any rights that plaintiffs possessed when the Forest Service adopted the Eyerly Project: Plaintiffs did not have any license or permit concerning the Deschutes National Forest, and any expectation of success in this litigation they may have had based upon the earlier regulations is not the sort of expectation protected by the presumption against retroactivity. *See id.* The new regulations neither increase the Forest Service's liability for past conduct nor impose new duties on the agency regarding MIS. Instead, the only portion of the new regulations that addresses MIS provides that, unless an existing Forest Plan explicitly requires population monitoring or surveying, the Forest Service may meet any obligation it has to monitor MIS pursuant to a forest plan by considering habitat data. These provisions in no way increase the Forest Service's liability or increase its duties as to MIS.

The regulations upon which plaintiffs' claim that the Forest Service failed to conduct required surveys for MIS populations is based have been withdrawn. Because the new regulations are now applicable, the earlier regulations upon which the first claim is based no longer have any

binding legal effect as to the Eyerly Project. Defendants are entitled to summary judgment on the first claim because it is now moot.

██ Even if I concluded that the new regulations should not be applied retroactively, I would recommend granting defendants' motion for summary judgment on plaintiffs' first claim because the Forest Service's determination that the Eyerly Project complied with the 1982 regulations was not arbitrary or capricious or contrary to law. The 1982 regulations defined a viable population as one which "has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area," 36 C.F.R. § 219.19, required identification and selection of MIS for areas covered by a forest plan, 36 C.F.R. § 219(a)(1), and required monitoring of MIS population trends. 36 C.F.R. § 219.19(a)(6).

██ In several decisions, the Ninth Circuit has upheld MIS analysis that evaluates the effects of various management alternatives on MIS populations by analyzing the amount of habitat affected by particular alternatives rather than through population counts. *Inland Empire Public Lands Council v. United States Forest Service*, 88 F.3d 754, 759, 763 (9th Cir. 1996); *see also, Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1154 (9th Cir. 1998) (Forest Service's decision to address regulatory requirement by evaluation of habitat not arbitrary or capricious); *Neighbors of Cuddy Mountain v. United States Forest Service*, 137 F.3d 1372, 1380 (9th Cir.1998) (regulatory requirement can be satisfied by evaluating suitable habitat). However, in *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 972 (9th Cir. 2002), the Ninth Circuit concluded that, under the particular facts before it, "the Forest Service's use of habitat as a proxy for population monitoring of the [MIS] was

arbitrary and capricious" because the methodology employed was extremely inaccurate. These decisions confirm that, if the methodology used for evaluating the effect of a plan on MIS populations is reasonably accurate, there is no absolute requirement that the Forest Service conduct population counts of MIS when analyzing management alternatives.

The method employed by the Forest Service here satisfied that requirement. Plaintiffs challenge the Forest Service's evaluation of "primary cavity excavator" (PCE) species, one of the fifteen bird MIS and four mammal MIS that the Forest Service evaluated in designing the Eyerly Project. The Forest Service identified seven PCE birds as MIS requiring varying numbers of snags per acre in habitat in the area of the Project. AR06378. In order to evaluate the effect of the fire and the Eyerly Project on PCE habitat and snag density, the Forest Service created a model based upon a photo database of the Deschutes National Forest, physical stand exams, information on burn intensity derived from satellite data following the fire, district-wide snag inventory data, and the DecAID database. AR06366.

Not surprisingly, the Forest Service found that, as a result of the fire, there is currently an abundance of snag habitat for the seven PCE in the Project area. AR06380. In the EIS for the Eyerly Project, the Forest Service compared the snag habitat that would remain for each PCE species under the various alternatives. AR06435. The Forest Service's calculations indicate that, though snag retention is lower under the selected alternative than under the "no action" alternative, snag retention under the selected alternative far exceeds the snag retention level required under the Forest Plan, AR06396, and that ample snag habitat is provided under the Eyerly Project to maintain via-

ble PCE populations. *See* AR06396. The Forest Service concluded that, as to the seven PCEs, the Project was consistent with the population requirements set out in the 1982 regulations. That conclusion was not arbitrary or capricious.

In concluding that the Forest Service's analysis of the effect of the Project on PCE species was not arbitrary or capricious, I have examined the parties' arguments concerning use of the DecAID program. As the Forest Service acknowledged, DecAID cannot predict a population's responses to management activities. AR06366. Instead, DecAID compiles and summarizes data on wildlife's use of snags and deadwood from scientific literature, field research, and wildlife and forest inventory databases. *Id.* The DecAID program allows a decision maker to analyze the levels of snags that have been associated with particular populations of wildlife in past studies, and assists in evaluating the probable effects of management activities on snag and decayed wood habitat. *Id.*

■ If it employs a reasonable methodology and discloses the inherent limitations of the methodology, an agency's choice of a particular analytical method is generally entitled to judicial deference. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Here, the Forest Service's use of DecAID was reasonable, and the limitations of that program were disclosed. The Administrative Record indicates that DecAID was used only to supplement information derived from other sources, including empirical studies, in evaluating the differences in levels of snag habitat retained under various alternatives. AR06366; AR06435–36. This use of DecAid was permissible, and defendants would be entitled to summary judgment on plaintiffs' first claim even if the 1982 regulations applied.

■ The final portion of plaintiffs' first claim alleges that the Forest Service violated the NFMA and the Deschutes LRMP by failing to ensure that adequate snags would exist to maintain viable populations of MIS after the Eyerly Project was completed. This portion of the claim fails because, in analyzing the effects of the Project, the Forest Service applied the snag-retention levels required in the Metolius LSR throughout the Project area. The record indicates that the levels of snag retention in the LSR comply with forest plan requirements, and that the retention levels for the remainder of the Project exceed the forest plan requirements for those areas. AR06203. Accordingly, defendants are entitled to summary judgment on this aspect of plaintiffs' first claim as well.

2. *Alleged Violation of the NFMA by Authorization of Logging in Late–Successional Reserve*

■ As noted above, plaintiffs' second claim alleges that the Forest Service's authorization of "extensive" logging in the Late–Successional Reserve (LSR) violates the NFMA because it is inconsistent with the amendments made to the Deschutes Forest Plan under the Northwest Forest Plan (NFP).

The Forest Plan for the Deschutes National Forest was amended by the NFP in 1994. AR00238–473. The NFP established standards and guidelines for land use allocations which sometimes overlapped allocations already set out in the Deschutes Forest Plan. In case of a conflict between the plans, the more restrictive guidelines apply. AR00372, AR00399.

The NFP included LSRs and Administratively Withdrawn Areas (AWA). LSRs are areas that are supposed to be managed to protect and enhance conditions of late-successional and old-growth areas which

provide habitat for certain species, including the Northern Spotted Owl. AR00381. AWAs are areas which were already being managed to provide benefit to old-growth species under existing Forest Plans. *See* AR00399, AR06183.

The Deschutes Forest Plan prescribed a management allocation known as the Metolius Wildlife/Primitive Area. AR00099. The Metolius Wildlife/Primitive Area includes 13,100 acres on the Deschutes National Forest. Approximately 6,993 acres of land included in that Wildlife/Primitive area are included in the Eyerly Project area. Of that 6,993 acres, approximately 2,180 acres overlap with the NFP LSR allocation, 2,088 acres overlap with the NFP AWA allocation, and 2,724 are not covered by the NFP. AR06201.

Though scheduled timber harvest is not allowed in AWAs, salvage logging may be permitted. *Id.* NFP guidelines also allow for salvage logging of dead trees in LSRs "following a stand-replacing event" such as a fire, and note that salvage harvest may "facilitate habitat recovery" by reducing the risk of such events. AR00383. NFP guidelines indicate that a number of limitations on salvage harvest in LSRs are appropriate. *See* AR00384–86. These include restricting salvage logging to areas where fires have reduced tree canopy closure to less than 40%, designing salvage harvest in a way that will "accelerate or not impede" the development of late successional forests, and directing that any salvage logging plan "should focus on retaining snags that are likely to persist until late-successional conditions have developed and the new stand is again producing large snags." AR00384. The Guidelines indicate that, when salvage logging is carried out in an LSR, all live trees should be retained. *Id.*

The Administrative Record does not support plaintiffs' allegation that the Eyerly Project is inconsistent with these guidelines. Instead, the EIS for the Eyerly Project includes an explanation of how each of the LSR guidelines is to be met under the Project. Salvage harvest in the LSR is limited to areas where fire has reduced tree canopy closure to less than 40%, and no live trees are to be cut. AR06562; AR06563. The snag and down woody debris requirements set out in the Metolius LSR Assessment appear to be satisfied or exceeded, AR06562, and the Project provides for rapid establishment of tree species and sizes considered important to late successional species. AR06563. Fire-damaged trees that are not dead are left to die to provide new snags, and the largest dead snags are retained. *Id.* The Project is designed to retain snags "likely to persist until late successional conditions have developed and the new stand is again producing large snags." AR00384. As part of the attempt to ensure that snags remain standing until late successional conditions have been restored, no salvage logging at all is planned on 71% of the burned area of the LSR. *Id.* No salvage logging is to take place in any areas which still exhibit late and old structural stand characteristics, AR006562, or in any spotted owl habitat. AR06419.

The Forest Plan allows for the harvest in "catastrophic situations," and requires that the Forest Service attempt to "protect or create suitable wildlife habitat during any harvest activities." AR00100. The Forest Service properly determined that the Eyerly Fire was a "catastrophic situation." AR06182. The Administrative Record does not support plaintiffs' assertion that the proposed salvage harvest in the Metolius LSR and the Metolius Wildlife/Primitive Area is inconsistent the Forest Service's obligation to protect or create suitable wildlife habitat, or with any other Forest Plan standards applicable to those areas. Defendants are therefore entitled

to summary judgment on plaintiffs' second claim.

3. *Alleged Failure to Consider a "Restoration Only" Alternative*

Plaintiffs' third claim alleges that the Forest Service violated NEPA by failing to consider a "restoration only" alternative for area burned in the Eyerly Fire.

 Though NEPA requires that an EIS examine all reasonable alternatives to a proposed project, *see* 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14, only those alternatives that are "reasonably related to the purposes of the project" must be considered. *Laguna Greenbelt, Inc. v. United States Dep't of Transp.*, 42 F.3d 517, 524 (9th Cir.1994) (*citing City of Angoon v. Hodel*, 803 F.2d 1016, 1021–22 (9th Cir.1986)) (*cert. denied*, 484 U.S. 870, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987)). In determining if an agency has considered the appropriate range of alternatives, the key issue is " 'whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation.' " *Westlands Water Dist. v. United States Dep't of Interior*, 376 F.3d 853, 868 (9th Cir.2004) (*quoting California v. Block*, 690 F.2d 753, 767 (9th Cir.1982)).

 Here, the stated purposes of the Eyerly Project included recovery of the economic value of the trees that were either killed by or expected to die as a result of the Eyerly fire. AR06198. The Administrative Record indicates that the Forest Service considered a "restoration-only" alternative when designing the Eyerly Project, but that it eliminated this alternative from further consideration because that alternative "would not have met the purpose and need [of] recovering economic value of fire-killed and damaged trees." AR06197.

Plaintiffs assert that the Forest Service could not properly seek to recover the economic value of dead and dying trees because the NHP prohibits salvage logging in LSRs and Wildlife/Primitive areas to recover economic value. However, the portion of the Administrative Record that plaintiffs cite in support of this proposition, AR00341, does not include a prohibition on such logging, and the NFP explicitly permits salvage harvests following stand replacing fires. AR00384.

Plaintiffs also contend that the Forest Service did not adequately respond to their suggestion, made during the public comment period, that it should consider an alternative that would have removed small diameter snags but left large diameter snags to "act as water reservoirs." Plaintiffs' memorandum in support of motion for summary judgment at 25. However, the Administrative Record indicates that the Forest Service considered, but rejected, this suggestion because large snags in the area of the Eyerly Fire itself had not acted as "water reservoirs," but instead had been "completely consumed over extensive areas of the fire, contributing to tree mortality and severe soil burning." AR06681.

The Administrative Record establishes that the Forest Service considered a "restoration only" alternative, and that it chose not to analyze that alternative in detail because such an alternative could not satisfy one of the purposes of the Project. The record does not support plaintiffs' assertion that salvage logging to recover economic value is prohibited in LSRs and Wildlife/Primitive areas, or plaintiffs' contention that the Forest Service should have given further consideration to leaving more large diameter snags. Based upon this record, plaintiffs cannot establish that the Forest Service's elimination of the "restoration only" alternative without further consideration was arbitrary or capricious, or that the Forest Service's failure to further consider a "restoration only"

alternative otherwise violated NEPA. Defendants are therefore entitled to summary judgment on plaintiffs' third claim.

4. *Alleged Violation of NEPA Through Failure to Adequately Assess Direct, Indirect, and Cumulative Impacts of Project on Water Quality, Wildlife, and Soils*

 Plaintiffs' fourth claim alleges that the EIS prepared for the Eyerly Salvage Project violates NEPA because it does not adequately assess the direct, indirect, and cumulative impacts of the Eyerly Project.

 In evaluating the impact of a proposed project, an agency must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). A cumulative impact is an impact that "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency ... or person undertakes such other actions." 40 C.F.R. § 1508.7.

As noted above, judicial review of an EIS under NEPA is limited, and an EIS is legally sufficient if it " 'contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences' " of the action in question. *National Parks & Conservation Association,* 222 F.3d at 680 (*quoting Kunzman,* 817 F.2d at 492). Courts accord substantial deference to an agency's determination of the scope of its "cumulative effects" review. *E.g., Alexander,* 303 F.3d at 1071.

The EIS prepared for the Eyerly Project includes a sufficient assessment of the probable environmental consequences of the Project. The third chapter of the EIS, which includes a 300–page analysis of the impacts of the Project and its alternatives, addresses water quality, wildlife, and soils at length. *See* AR06246–567. The discussion of water quality addresses stream flow, sedimentation, channel condition, stream temperature, and stream chemistry. AR06310, AR06312–14, AR06320–32, AR06360.

The EIS also includes an extensive assessment of the likely impact of the Project on wildlife. The EIS evaluates potential impacts on the Canada lynx (AR06370), the northern bald eagle (AR06371), the northern spotted owl (AR06373), and the Oregon spotted frog (AR06376), which are federally listed species. The Forest Service concluded that no salvage logging would be conducted in the Canada lynx, spotted owl, or spotted frog habitat. AR06418–19. The Forest Service also concluded that, though removal of hazard trees would likely adversely impact bald eagles, this activity, which was required because of the threat the trees posed to public safety, was "not likely to jeopardize the continued existence of the bald eagle." AR05158; AR07528.

The Forest Service evaluated the impacts of the Project on a number of wildlife species that are included on the Region 6 "sensitive species" list, and concluded that these species would not be affected. AR06419–20. It also considered the impacts on Deschutes National Forest MIS, including Primary Cavity Excavating birds (AR06434), Cooper's and sharp-shinned hawks (AR06436), flammulated owl (AR06437), great blue heron (AR06438), great gray owl (AR06438), northern goshawk (AR06439), osprey (AR0640), redtail hawk (AR0640), American marten (AR06441), bats (AR06442), deer (AR06443), and elk (AR06444). The EIS includes individual cumulative impacts analyses for a number of species. AR06422–27, AR06454–63.

The EIS explicitly addressed the impact of the Project on the physical and chemical qualities of the soils in the affected area, and concluded that soil conditions would

meet or exceed the standards and guidelines included in the Forest Plan. AR07522. To minimize impacts on soils, the Project provides for helicopter or skyline logging of all units in which slopes of 30% or greater predominate. AR06211. The EIS discloses and evaluates the Project's effects on soil chemistry and biota. AR06286. It also addresses the cumulative impacts of the Eyerly Project and other past, present, and reasonably foreseeable future actions on the soils in the affected area. AR06293.

Plaintiffs contend that the EIS is insufficient because the Forest Service failed to consider the cumulative detrimental impacts of the Eyerly Project and the Davis Fire Recovery Project, the 18 Fires Recovery Project, and the B & B Fire Project. I disagree. As noted above, agencies are afforded considerable deference in determining the scope of review of cumulative impacts. Defendants note that the Davis Fire Project and the 18 Fires Project are on different watersheds and are a significant distance from the Eyerly Project, and that the B & B Project is still only a proposal. The Forest Service's decision not to include a cumulative impact analysis of the Davis Fire Project and the 18 Fires Project was not arbitrary or capricious, given the geographic distance and lack of ecological connection between those Projects. The Draft EIS for the B & B Project includes an assessment of the potential cumulative impacts of the salvage harvest plans in the Eyerly Project and B & B Project activities. This satisfies any requirement that the cumulative effects of these projects be considered, because an agency may address the potential cumulative effects of two projects in the environmental analysis prepared for the latter of the projects. *See Idaho Sporting Congress,* 137 F.3d at 1152.

Defendants are entitled to summary judgment on plaintiffs' fourth claim.

5. *Alleged Violation of NFMA Through Failure to Comply with Forest Plan Standards and Guidelines Designed to Protect Soils*

Plaintiffs' fifth claim alleges that the Eyerly Salvage Logging Project will violate Forest Plan Standards and Guidelines designed to protect soils.

The Deschutes Forest Plan sets out standards and guidelines that are intended to maintain or enhance long-term soil productivity. AR06253. These standards and guidelines are supplemented by a Regional Forest Service Manual Supplement (R6 Supplement) that defines specific detrimental soil conditions and provides guidance for designing and implementing projects. AR06253; AR01296–1302. The R6 Supplement seeks to limit detrimental soil conditions to less than 20% of the area covered by an activity such as timber harvesting. *Id.* Compaction of topsoil is a detrimental soil condition. *Id.*

The R6 Supplement specifies several methods for complying with the 20% limit. For areas in which less than 20% detrimental soil conditions exist before new activities are carried out, compliance may be achieved by performing restoration that ensures that "the cumulative detrimental effect of the current activity following project implementation and restoration" does not exceed the 20% limit. AR06254. As to areas where more than 20% detrimental soil conditions exist before the new activities are carried out, "the cumulative detrimental effects from the project implementation and restoration must, at a minimum, not exceed the conditions prior to the planned activity and should move toward a net improvement in soil quality." *Id.*

The EIS for the Eyerly Project states that ground-based logging will result in detrimental compaction on 15 to 20% of the unit area. AR06272. The EIS further identifies 55 of 126 salvage units in which the 20% detrimental compaction standard

may be exceeded following harvest. AR06594–97, AR06739. For those areas in which logging is expected to result in compaction exceeding the 20% limit, the Project includes plans for "subsoiling," a method of tilling to reduce compaction. AR06272; *see* AR06594–97 (indicating soil conditions on various units, compaction Project is expected to produce, and acres to be "subsoiled" to reduce compaction).

Plaintiffs contend that the soil compaction that will be caused by the Eyerly Project violates the NFMA because the R6 Supplement upon which the Forest Service premises compliance with soil requirements is not legally binding. Pltff's mem. in support of motion for sum. jud. at 12. They assert that the Deschutes Forest Plan prohibits any management activities that cause soil compaction on more than 20% of the affected area. I disagree. Though defendants agree that the Forest Service Manual does not impose legally binding obligations, the Deschutes Forest Plan itself permits management activities in detrimentally compacted areas and allows the use of mitigating activities to remedy excessive compaction. The Forest Plan specifies that a minimum of 80% of an activity area should be left "in a condition of acceptable productivity potential," and that "any sites where this direction cannot be met will require rehabilitation." AR00097. Tillage, the remedial method specified for areas of excess compaction in the Eyerly Project, is specifically cited as a method of rehabilitation. *Id.* Accordingly, the Forest Service's plan to restore areas where detrimental compaction exceeds 20% through subsoiling is consistent with the Forest Plan and does not violate the NFMA.

■ In their memorandum in support of their motion for summary judgment, plaintiffs also assert that the Forest Service's plan to rehabilitate compacted soil through subsoiling violates NEPA because

the Forest Service failed to provide adequate data addressing this mitigation technique. Pltff's mem. in support of motion for sum. jud. at 13. This issue is not properly before the court because plaintiffs did not raise it in their administrative appeals (AR07706, AR07720) or in their complaint. *See, e.g., Dep't of Transp. v. Public Citizen,* 541 U.S. 752, 764–65, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004) (NEPA plaintiff cannot raise issue before court not raised before agency).

■ Even if plaintiffs had properly raised this issue, their argument would fail. The subsoiling plan complies with NEPA because the Forest Service has satisfied its obligation to provide a "reasonably complete discussion of possible mitigation measures." *Robertson,* 490 U.S. at 352, 109 S.Ct. 1835. The EIS notes research by Deschutes National Forest soil scientist finding that subsoiling effectively increases water infiltration and enhances root development, and research conducted on the Deschutes National Forest by an Oregon State University Professor. AR01390–97, AR06278. Based upon these studies and applying its expertise, the Forest Service concluded that the proposed mitigation would be "moderately effective," and indicated that the mitigation would be monitored and modified if necessary. AR06740. If this issue were properly before the court, I would conclude that the Forest Service's discussion of the effectiveness of the mitigation technique was sufficiently complete to satisfy the requirements of NEPA.

Defendants' motion for summary judgment on plaintiffs' fifth claim should be granted.

6. *Alleged Violation of NFMA Through Authorization of Salvage Logging in Metolius Wildlife/Primitive Area*

■ Plaintiffs' sixth claim alleges that the Forest Service's proposal to conduct

salvage logging operations in the Metolius Wildlife/Primitive Area violates the NFMA because it is inconsistent with the Deschutes Forest Plan.

As noted above, approximately 6,993 acres of the Eyerly Project includes an area which the Eyerly Fire burned in the Metolius Wildlife/Primitive Area of the Deschutes National Forest. The Deschutes Forest Plan provides for management of the Metolius Wildlife/Primitive Area in a manner that will "provide habitat for a wide variety of wildlife species, and to specifically maintain or enhance habitat for bald eagles," and that will "protect and perpetuate a predominantly unmodified natural environment where natural ecological processes can continue." AR06182; AR00099. Though timber harvest is generally not allowed in the Metolius Wildlife/Primitive Area, harvest is allowed in "catastrophic situations," which the Forest Service determined described the results of the Eyerly Fire. AR06182. The Forest Plan requires that efforts be made "to protect or create suitable wildlife habitat during any harvest activities." AR00100.

The Administrative Record supports only the conclusion that the Forest Service's characterization of the Eyerly Fire as a "catastrophic event" was reasonable, and that the proposed salvage logging plan is consistent with the agency's obligation to protect the natural environment and to protect or create suitable wildlife habitat. The Forest Service has proposed salvage logging on only 977 acres of the 6,993 acres of the Metolius Wildlife/Primitive Area burned in the Eyerly Fire. This will leave 86% of the habitat available to wildlife that can exist in the burned habitat. As noted above, in the areas in which salvage logging is planned, the snag and down wood critical to habitat needed for a number of wildlife species will remain at

levels that meet or exceed the standards for the Metolius Wildlife/Primitive Area set out in the Forest Plan. *See* AR06203; AR06563. In keeping with the emphasis on bald eagle habitat set out in the Forest Plan, only dead trees that pose a danger to human safety along roads or in campgrounds will be removed from essential bald eagle habitat. AR06415–16; AR06418; AR07524.

Defendants are entitled to summary judgment on plaintiffs' sixth claim.

7. *Assertion that Forest Service Violated NEPA by Failing to Disclose and Analyze Controversy Regarding Effect of Salvage Logging on Risk of Future Wildfires*

 The goals of the Eyerly Project include reduction of the severity of future wildfires through removal of some dead wood that will otherwise fall and build up the forest fuel load. AR06173. Plaintiffs assert that the Forest Service violated NEPA "by asserting, without any scientific support, that logging in a post-fire environment will reduce the risk of future catastrophic wildfire."[1] Pltff's mem. in support of motion for sum. jud. at 28 (*citing* AR06174). Plaintiffs further assert that the Forest Service failed to adequately address the 1995 "Beschata Report," and failed to inform the public that its assumption that salvage logging would reduce the risk of such future fires is "highly controversial." *Id.* at 29.

This argument fails. Material included in the Administrative Record indicates that the Forest Service's conclusion that salvage logging would reduce the severity of future fires was based upon the kind of scientific analysis required under NEPA, and demonstrates that the Forest Service

---

**1.** Though I find no direct reference to this issue in the claims set out in plaintiffs' complaint, plaintiffs did raise this issue in their comments on the Draft EIS. AR04430.

adequately addressed the applicability of the Beschata Report. The EIS for the Eyerly Project includes an extensive appendix addressing the applicability of the Beschata Report to the Project. AR06613–27. In response to public comments concerning the impact of salvage harvest on future wildfires, the Forest Service identified the Brown Study, a recent scientific study which concluded that "reburn results when falldown of old burned forest contributes significantly to the fire behavior and fire effects of the next fire." AR06664. The Forest Service discussed the conclusions of Brown, et al., concerning the fire hazard posed by the buildup of woody debris in habitat types like those found in the area of the Eyerly Project. *Id.*

The Administrative Record also includes a report by Forest Service Resource Specialist Richard Everett evaluating the Beschata Report and other research regarding the impact of salvage harvest on future fires. AR00660. The Everett Report concluded that the research suggested that conducting salvage harvest had desirable effects on soils and fuel levels. AR00665. In addition, in the Record of Decision, defendant Weldon, the Deschutes National Forest Supervisor, specifically addressed the range of scientific opinion concerning the effects of salvage harvest on the severity of future wildfires. AR07519.

The Forest Service adequately disclosed the range of scientific opinion concerning the effects of salvage harvest on future wildfires, and provided a reasonably thorough discussion of the probable environmental consequences of the decision to conduct salvage logging operations. Resolution of any conflicts in scientific opinion on these issues was a matter for the agency, and not the court. *E.g., Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 986 (9th Cir.1985).

## CONCLUSION

Plaintiffs' motion for summary judgment (# 16–1) should be DENIED, and defendants' motion for summary judgment (# 20–1) should be GRANTED.

Plaintiffs' motion to strike the declaration of Kim Mellen (# 33–1) and alternative motion for an evidentiary hearing (# 33–2) are DENIED.

## SCHEDULING ORDER

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due July 29, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objection. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or the latest date for filing a response.

Dated this 13th day of July, 2005.