HELENA HUNTER & ANGLERS, a non-profit organization; the Alliance for the Wild Rockies, a non-profit organization; American Wildlands, a non-profit organization; Native Ecosystems Council, a non-profit organization, Plaintiffs,

v.

Tom TIDWELL, in his official capacity as Regional Forester for the United States Forest Service, Region One; the United States Forest Service, an agency of the United States Department of Agriculture; and the United States Department of Agriculture, a federal department, Defendants.

No. CV 08–162–M–DWM.

United States District Court,
D. Montana,
Missoula Division.

July 29, 2009.

Matthew Kellogg Bishop, Helena, MT, Sarah K. McMillan, Missoula, MT, for Plaintiffs.

Erik Edward Petersen, U.S. Department of Justice, Washington, DC, Mark Steger Smith, Office of the U.S. Attorney, Billings, MT, for Defendants.

## ORDER

DONALD W. MOLLOY, District Judge.

### I. Introduction

Helena Hunters and Anglers, Alliance for the Wild Rockies, American Wildlands, and Native Ecosystems Council (collectively "Plaintiffs") bring this action seeking judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 and citizen suit provision of the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g), regarding agency actions by the United States Forest Service ("Forest Service"). The challenge concerns the Forest Service's decision to issue the Montana Army National Guard a special use permit to construct a biathlon training facility on the Helena National Forest near Mac-Donald Pass. The Complaint alleges the agency violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 et seq., and Section 7 of the ESA. The parties have filed cross-motions for summary judgment. For the reasons set forth below, relief is granted on some claims and denied on others.

### II. Factual Background

The Montana Army National Guard proposed constructing a biathlon training facility on the Helena National Forest near MacDonald Pass. AR H1 at 22.[1] The proposed facility would be located west of Helena on Highway 12, just east of the continental divide. It overlaps with a system of cross-country ski trails maintained on the Helena National Forest. AR H1 at 36.

The proposed biathlon facility involves construction and maintenance of a road, a parking area, various buildings, a shooting range, and ski trails in an area with existing trails. AR H1 at 22. The National Guard proposal seeks to implement a project that would disturb a total of about 33 acres and require removing 18 acres of trees. AR H1 at 38, Table 2–2. The proposed action includes five buildings and a spectator deck, as well as a 50–vehicle parking lot and quarter-mile access road. AR H1 at 39. Tree removal is intended to facilitate widening of trails, construction of new trails, buildings, and the parking area, and construction of the access road. AR H1 at 38. Under the proposed action, approximately 2.2 miles of new ski trails would be constructed, and 8.1 miles of trail would be reconstructed where necessary.

---

1. Citations to the Administrative Record (AR) are designated by "document number" at "Adobe Acrobat page number" (not the page number found on the face of the documents).

AR H1 at 37. The National Guard proposed weekend use over the winter, occasional use during the summer and fall for maintenance and training, and restricting spring use except for maintenance. AR H1 at 42.

Pursuant to NEPA, the Forest Service conducted an Environmental Assessment ("EA") to determine whether the proposed action would cause significant impacts that require the preparation of an Environmental Impact Statement ("EIS"). Following completion of the EA and the public comment process, on June 12, 2008, the Forest Service issued a Decision Notice and Finding of No Significant Impact ("FONSI"). AR H2.

The preferred alternative modifies the National Guard's proposed action in several ways to minimize impacts. Among other things, the shooting range was relocated so it is adjacent to a wetland area, rather than in the wetland. Other facilities were moved to minimize impacts to wet areas. AR H1 at 47. The number and size of the buildings were reduced to minimize impacts to vegetation and soil. Under Alternative 3, 31.84 total acres would be disturbed, and 17.86 acres of trees removed. In addition, the permit would restrict summer use to one competition and limit fall and spring use to maintenance activities, in part to minimize wildlife impacts. Alternative 3 also proposes eliminating grooming segments of certain ski trails for the purpose of complying with lynx management goals. AR H1 at 43–44.

### III. Standard of Review

#### A. Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Summary judgment is a particularly appropriate tool for resolving claims challenging agency action. *See Occidental Eng. Co. v. INS,* 753 F.2d 766, 770 (9th Cir.1985). Summary judgment is appropriate in this case because the issues presented address the legality of Defendants' actions based on the administrative record and do not require resolution of factual disputes. The questions presented are legal, not factual, and must be measured by the law and not preference.

#### B. Standard of APA Review

Judicial review of an agency's compliance with NEPA and NFMA is governed by the judicial review provisions of the APA. *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 891 (9th Cir.2002). Agency decisions can only be set aside under the APA if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (quoting 5 U.S.C. § 706(2)(A), overruled on other grounds by *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). Review under the arbitrary and capricious standard is "narrow," but "searching and careful." *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Agency action can be set aside "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The court must ask

"whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ... [The court] also must determine whether the [agency] articulated a rational connection between the facts found and the choice made. [The] review must not rubber-stamp ... administrative decisions that [the court deems] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Eng'rs,* 361 F.3d 1108, 1119 (9th Cir.2004) (internal citations and quotations omitted). Nevertheless, a court may not substitute its judgment for that of the agency or merely determine it would have decided an issue differently. *Or. Natural Res. Council,* 476 F.3d 1031, 1035 (9th Cir.2007).

## IV. Analysis

### A. NEPA

#### 1. Legal Standard

■ NEPA requires federal agencies to prepare an EIS whenever they propose to undertake any "major Federal action[ ] *significantly* affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (emphasis added). An agency may prepare an EA to determine whether an EIS is necessary. 40 C.F.R. § 1508.9. An EA is "a concise public document for which a Federal agency is responsible that serves to [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Id.* "Even though an EA need not conform to all the requirements of an EIS, it must be sufficient to establish the reasonableness of th[e] decision not to prepare an EIS." *Ctr. for Biological Diversity v. Natl. Highway Traffic Safety Admin.,* 538 F.3d 1172, 1215 (9th Cir.2008).

#### 2. Significant impacts

■ An agency need only prepare an EIS, as opposed to an EA, if a project will have significant impacts.

Where an EIS is not categorically required, the agency must prepare an Environmental Assessment to determine whether the environmental impact is significant enough to warrant an EIS.... If the action will significantly affect the environment, an EIS must be prepared, while if the project will have only an insignificant effect, the agency issues a FONSI.

*Ocean Advocates v. U.S. Army Corps of Engineers,* 402 F.3d 846, 864–65 (9th Cir. 2005) (citations omitted). If there are substantial questions about whether there may be significant impacts, the agency must prepare an EIS. *Id.*

To determine if an action is "significant," an agency must consider both the context and intensity of the proposed action. 40 C.F.R. § 1508.27. To evaluate intensity, the agency must consider the severity of the impact. 40 C.F.R. § 1508.27(b). There are several factors to be considered in determining the intensity of a proposed action. Plaintiffs argue many of these factors indicate the proposed biathlon training facility will have significant impacts.

##### a. *Wetlands*

■ In evaluating significance, an agency must consider "[u]nique characteristics of the geographic area such as proximity to ... wetlands." 40 C.F.R. § 1508.27(b)(3). Plaintiffs assert the Forest Service did not adequately assess the impact of the project on wetlands.

The project area includes a 3.7 acre wetland and a .5 acre wetland area. Under the preferred alternative, Alternative 3, the shooting range and parking lot

would be located near the larger wetland area, and several of the proposed trails would cross the wetland and connected drainages. AR H1 at 137. A map of the proposed project depicts the wetland area abutting the proposed shooting range, target building, and spectator deck. In addition, the map shows several proposed ski trails cross the wetland area. AR H1 at 47. Under the National Guard's proposed action, the shooting range and associated buildings would have been constructed in the wetland area, and they were relocated in an effort to minimize impacts. AR H1 at 140–41.

While the EA includes an section discussing the impacts on wetlands and ultimately concludes that any impacts will be minimal, other statements in the EA and the description of the effects are difficult to reconcile with this conclusion. The EA states that under the preferred alternative:

> The impacts of construction and placement of the new access road, parking lot, ski trails, or biathlon buildings and facilities would alter the physical, chemical, and biological processes or attributes that are vital to the integrity of the wetland system in such a way that they are diminished.

AR H1 at 139. The preferred alternative purports to minimize wetland impacts by moving the facilities out of the wetland, but the map depicts the facilities as adjacent to the wetland area. The EA contains no consideration whether this proposed "proximity to ... wetlands" will cause impacts even though the facility would not be constructed inside the wetland area. 40 C.F.R. § 1508.27(b)(3). There would also be short and long-term impacts to the wetland, including impacts from road and trail construction: "crossings of the perennial and intermittent drainages would also have potential to al-

ter characteristics of the wetlands and waters of the U.S. and their functions and values." AR H1 at 140.

While the Court must defer to the Forest Service's expertise, the agency still must "articulate[ ] a rational connection between the facts found and the choice made." *Ocean Advocates,* 361 F.3d at 1119. The EA contradicts itself because it describes long-term permanent effects to the wetlands, and it also fails to consider whether the proximity of the facility to the wetland will have any impact. The facts, as stated by the agency, are not consistent with its conclusion. Therefore, the agency did not properly consider this factor, and its conclusion that the wetlands impacts will not be significant is arbitrary and capricious.

b. *Ecologically critical area and highly controversial or uncertain effects*

An agency must consider "[u]nique characteristics of the geographic area such as proximity to ... ecologically critical areas." 40 C.F.R. § 1508.27(b)(3). An agency should also consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial" and "[t]he degree to which the possible effects on the human environment are highly uncertain." 40 C.F.R. § 1508.27(b)(4)-(5). "A proposal is highly controversial when there is a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." *Anderson v. Evans,* 371 F.3d 475, 489 (9th Cir.2004) (citation omitted). Where state agencies disagreed with the Forest Service about the likely effect of a road reopening, the Ninth Circuit concluded that the action was controversial and required preparation of an EIS. *Foundation for N. Amer. Wild Sheep v. U.S. Dept. of Agriculture,* 681 F.2d 1172, 1182 (9th Cir.1982). "Preparation of an EIS is mandated where uncer-

tainty may be resolved by further collection of data or where the collection of such data may prevent speculation on potential effects. The purpose of an EIS is to obviate the need for speculation." *Ocean Advocates,* 402 F.3d at 870 (citations omitted).

█ Plaintiffs argue the proposed biathlon facility would be located in an ecologically critical area because it is situated on a narrow strip of public land the Plaintiffs claim is a key wildlife corridor. Plaintiffs contend that, at the very least, the agency disagreement as to whether the area is a wildlife corridor and the lack of information about possible impacts warrant an EIS. They focus on comments and data submitted by the Montana Department of Fish, Wildlife, and Parks ("FWP") which raise concerns about the area's role as a wildlife corridor and disagree with the conclusions of the Forest Service that the area is not an important wildlife linkage zone. The Forest Service responds that there is little support for the contention that the area is an important wildlife corridor. Instead, the Forest Service argues that Plaintiffs' claims are based on theoretical models of the area as a wildlife corridor which are not supported by the available data.

FWP's opposition to the project and concern that the facility is located in and will negatively affect a wildlife corridor is a controversy that warrants preparation of an EIS. *Foundation for N. Amer. Wild Sheep,* 681 F.2d at 1182. Comments by FWP both in the scoping process and in response to the draft EA raise concerns about habitat connectivity and argue that there will be greater impacts than disclosed in the EA. AR C184 at 1–2; AR J46 at 8–12. FWP also relies on a theoretical map which indicates the importance of the proposed project area as a wildlife corridor. AR D98. However, FWP staff conceded that no data had been collected to

substantiate the theoretical mapping, although anecdotal evidence supports the theory. AR D68a at 3–4. Because no data exists to support or discount the theoretical mapping, the Forest Service chooses to completely disregard the position of the agency. Def. Br. at 13–15. However, given the "substantial dispute [about] the . . . nature, or effect" of the proposed biathlon facility on a possible wildlife linkage zone, further analysis is necessary to resolve the controversy. *Anderson,* 371 F.3d at 489 (citation omitted). Although the Forest Service argues that the scientific literature supports its position, as discussed below, it relies largely on an absence of information rather than data that would disprove FWP's position.

It is uncertain whether the proposed biathlon facility is in the middle of a wildlife corridor or will have an impact on wildlife use of the area as a linkage zone. The EA repeatedly discusses the possibility that the facility is in an area important for wildlife linkage, but reflects uncertainty about the possible impacts of the project. The EA recognizes that MacDonald Pass, including the proposed facility area, "is tentatively mapped as potential linkage habitat for Canada lynx . . . and may be important to the movement of lynx between larger blocks of suitable habitat." AR H1 at 151. It also concludes that the area from Rogers Pass to MacDonald Pass "has potential to serve as a linkage area because of low human use and contiguous forested habitat," but goes on to state that no data are currently available to confirm this, although "efforts are underway" to obtain funding for data collection regarding wildlife movement. *Id.* at 165–66. The EA then states that the "limited amount of public land and uncertainty of future development on private land in this area accentuate the potential importance of wildlife linkage habitat in the area," but

notes that Highway 12 may serve as a barrier to use by wildlife. *Id.* at 166. However, the EA later notes that the biathlon facility "may still affect animal movements and detract from future linkage potential for some wildlife species." *Id.* at 197.

Other portions of the record also indicate that the Forest Service is aware the area may be important as a wildlife corridor, but lacks the data necessary to adequately analyze the issue. For example, the wildlife report admits that unpublished reports and mapping efforts by government and private entities suggest the area's importance to wildlife connectivity and that possible future development creates uncertainty about the impacts to wildlife. AR D109a at 92–93. In addition, a Forest Service report on restoring habitat connectivity specifies the area around MacDonald Pass as a key linkage area. AR F137 at 6–7.

There is uncertainty about whether the proposed facility is in a wildlife corridor and what the impacts will be, and the Forest Service did not adequately consider this uncertainty. The Forest Service is not able to conclude in the EA that the area is not an important wildlife corridor nor is it able to offer a firm prediction as to the biathlon facility's impacts on wildlife linkage. Instead, the Forest Service concluded, based on the lack of data, that there will be no significant impacts to wildlife linkage. A lack of data is not an indication that there will be no impacts, but suggests the need for further assessment to make an informed decision. An EIS is necessary to resolve this uncertainty because "further collection of data ... may prevent speculation on potential effects. The purpose of an EIS is to obviate the need for speculation." *Ocean Advocates,* 402 F.3d at 870 (citations omitted).

The Plaintiffs persuasively argue that there is both controversy and uncertainty as to whether the area serves as a wildlife corridor that will be impacted by the biathlon facility. It is unclear from the record whether the facility will impact an "ecologically critical area[ ]," 40 C.F.R. § 1508.27(b)(3), and an EIS will eliminate the uncertainty and provide a more complete analysis of the possible impacts on wildlife habitat connectivity.

### c. *Cumulative impacts*

■ The agency must also assess "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). A cumulative effects analysis must do more than simply catalogue past projects: it must also "provide adequate analysis about how these projects, and difference between the projects, are thought to have impacted the environment." *Great Basin Mine Watch v. Hankins,* 456 F.3d 955, 971–72 (9th Cir.2006) (citations omitted). However, it is not for the Court "to tell the Forest Service what specific evidence to include, nor how specifically to present it," provided the issue is adequately addressed in some way. *League of Wilderness Defenders–Blue Mountains Biodiversity Project v. USFS,* 549 F.3d 1211, 1218 (9th Cir. 2008).

■ Plaintiffs argue there is inadequate analysis of the cumulative impacts, in particular the impacts on the wildlife corridor. They list numerous projects that they claim the Forest Service failed to adequately consider in the analysis of cumulative impacts.

The Forest Service has a notable flaw in its cumulative impacts analysis: the failure to include in the EA a discussion of a project the Forest Service admitted would add to cumulative impacts, the Rimini Road project. In a series of emails prior

to the release of the draft EA, Forest Service personnel recognized the Forest Service "ha[d] not looked at the cumulative environmental consequences of the Rimini [Road] project.... This project would impact wildlife[,] specifically the cumulative effects." AR B10 at 1. Emails also state that "the Rimini Road Project should be looked at for cumulative effects; however, we will not do this before the [draft] EA is released for public comments." AR D94. Nothing in the draft or final EA addresses this project, which the Forest Service recognized was going to cause cumulative impacts before the draft EA.

The Forest Service points to parts of the record that it claims show an analysis of the cumulative effects of this project. However, one of these merely lists the project in a table of other activities and contains no analysis of any possible cumulative impacts. AR D109a at A–3. The other was prepared after the draft EA and there is no evidence it was ever available for public comment. AR D111a at 12–16 (Supplemental Wildlife Specialist Report). This document was completed only a month before the final EA and Decision Notice were issued. *Id.* at 1. The Forest Service is correct that this Court may not mandate the particular procedure by which it considers cumulative impacts. *League of Wilderness Defenders–Blue Mountains Biodiversity Project,* 549 F.3d at 1218. However, the method chosen must comply with NEPA. Where the Forest Service uses a supplemental report "to present information and analysis that it was required, but ... failed to include in its original NEPA documents," the agency has failed to comply with NEPA. *Idaho Sporting Congress, Inc. v. Alexander,* 222 F.3d 562, 566–67 (9th Cir.2000). "It is inconsistent with NEPA for an agency to use [a supplemental report] ... to correct this type of lapse. NEPA is a procedural statute.... '[A]gency action taken without

observance of the procedure required by law will be set aside.'" *Id.* at 567 (quoting *Metcalf v. Daley,* 214 F.3d 1135, 1141 (9th Cir.2000)).

Because the Forest Service did not include a discussion of the Rimini Road project, which it admitted would add to cumulative impacts, in either the draft or final EA, its decision regarding cumulative impacts is arbitrary and capricious.

d. *Listed species and critical habitat*

■ Next, the Forest Service must consider "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the [ESA]." 40 C.F.R. § 1508.27(b)(9). In their opening brief, Plaintiffs simply note the presence of several listed species in the project area, but they do not explain why they believe the EA inadequately analyzed the impact of the biathlon facility on these species. Pl.'s .Br. at 9. The EA recognizes the presence of listed species and includes an assessment of the possible impacts on the species. AR H1 at 166–76. The Forest Service also produced a Wildlife Specialist's Report and Biological Evaluation regarding the impacts of the project on listed species, and consulted with the Fish and Wildlife Service. AR D109a; AR D96a; AR D97. The Forest Service complied with NEPA's requirement to consider whether there are impacts on listed species. This factor does not support Plaintiffs' argument that the project will cause significant impacts.

e. *Lewis and Clark County Resolution 2008–57*

An agency must consider "whether the action threatens a violation of Federal, State, or local law." 40 C.F.R. § 1508.27(b)(10). Plaintiffs argue the decision is inconsistent with Lewis and Clark

County Resolution 2008–57, which recognizes the importance of the Continental Divide ecosystem and "urges federal and state … agencies to protect and enhance" these resources. AR B23 at 2. This Resolution imposes no legal requirements on the Forest Service. Therefore, there cannot be a violation of the law, and any inconsistency of the project with the Resolution does not demonstrate the proposed action will have significant impacts.

### 3. Statement of Reasons

When an agency issues a FONSI and determines that preparation of an EIS is not necessary, "it must put forth a 'convincing statement of reasons' that explain why the project will impact the environment no more than insignificantly." *Ocean Advocates,* 402 F.3d at 864 (quoting *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir. 1998)).

Plaintiffs argue the Forest Service predetermined that the proposal would not cause significant impacts, and the statement of reasons is nothing more than a justification for a decision that was already made. This claim stems from examination of the Forest Service meeting notes and emails regarding the appropriate level of analysis for the project. On July 12, 2004, meeting notes show that the parties discussed the issue: "level of analysis determined to be EIS by [Forest Service]. [National Guard] contests this; want[s] to go with EA." AR A16a at 2. The notes also indicate that the Forest Service believed an EIS was necessary to respond to possible lynx issues and the potential for litigation, but that there was not funding: "[National Guard] won't apparently pay for EIS under the current situation." *Id.* Four days later, the Forest Service informed the National Guard via email that an EA would be acceptable, with no explanation for its changed position. The email stated: "While we are confident it won't be necessary, an [EIS] could be required to respond to concerns raised in the EA or subsequent litigation." *Id.* at 3.

The Forest Service violated NEPA by using its statement of reasons to support a pre-determined outcome that an EIS "won't be necessary." *Id.* at 3. The decision was arbitrary and capricious given the agency's position, only days before, that an EIS was necessary to address certain issues. There is no basis or explanation in the record for the altered position, other than the lack of available funding to pay for an EIS. The meeting notes show that the Forest Service believed the impacts from the project would be significant and would require an EIS. The FONSI appears to be only a post hoc justification for a decision that was made, not on the basis of the relevant analytical factors set forth in NEPA, but on the basis of the National Guard's reluctance to fund an EIS. Therefore, the matter must be remanded to the agency to conduct an EIS.

### B. NFMA

NFMA imposes both substantive and procedural requirements on the Forest Service. 16 U.S.C. §§ 1600–1687. Procedurally, it requires the Forest Service to develop a forest plan for each forest it manages. 16 U.S.C. § 1604(a). Individual site-specific projects must not only comply with NFMA, but must also be consistent with the governing forest plan. 16 U.S.C. § 1604(i); *Idaho Sporting Congress, Inc. v. Rittenhouse,* 305 F.3d 957, 961–62 (9th Cir.2002).

### 1. Region 1 Soil Quality Standards

Plaintiffs argue the project will violate soil quality standards. The Forest Service argues, however, that the soil stan-

dards do not apply to the biathlon facility because it is an intensively developed site.

The Northern Region Soil Quality Standards require that the Forest Service "[d]esign new activities that do not create detrimental soil conditions on more than 15 percent of an activity area." AR F182b at 2. This standard applies only to "lands where vegetation and water resource management are the principle objectives, that is, timber sales, grazing pastures or allotments, wildlife habitat and riparian areas. The standards do not apply to intensively developed sites such as mines, developed recreation sites, administrative sites, or rock quarries." *Id.* at 3.

Plaintiffs are wrong in arguing that the Forest Service should have applied the soil quality standard which prohibits more than 15% detrimental soil disturbance. The Forest Service has advanced a reasonable interpretation that the standard applies only to new activities. *See Native Ecosystems Council v. U.S. Forest Service,* 418 F.3d 953, 960 (9th Cir.2005) ("Agencies are entitled to deference to their interpretation of their own regulations, including Forest Plans.") The standard is written prospectively to dictate the soil conditions for new activities and allow no more than 15% disturbance in areas "where vegetation and water resource management are the principle objectives," even after the project is implemented. AR F182b at 3. Plaintiffs provide no legal support for their argument that the Forest Service must amend the Forest Plan before permitting an intensively developed site.

Although the Plaintiffs argue the Forest Service previously recognized that the soil standards apply to the biathlon facility, the agency has been consistent in its position throughout this process. Before drafting the EA, the Forest Service noted that Region 1 soil management guidelines apply, but did not find or imply that the

standards apply. AR A23 at 17. In both the draft and final EA, the Forest Service stated that the standards do not apply because the proposed project is an intensively developed site. AR J1 at 112; AR H1 at 121. The Forest Service has consistently taken the position that the soil standards do not apply to the biathlon facility, and that position is consistent with the standards themselves. The Forest Service's conclusion that the soil quality standards do not apply to the biathlon facility is not arbitrary and capricious, and the Forest Service did not violate NFMA.

### 2. Elk standard for hiding cover

#### a. *Administrative exhaustion*

▪▪▪▪ Next, Plaintiffs contend the project will not comply with the Forest Plan standard for elk hiding cover. The Defendants claim Plaintiffs did not administratively exhaust this issue and so are barred from raising it. The APA requires parties to exhaust all administrative appeal procedures before bringing an action in district court. 7 U.S.C. § 6912(e). "[A]s a general rule, if a petitioner fails to raise an issue before an administrative tribunal, it cannot be raised on appeal from that tribunal." *Reid v. Engen,* 765 F.2d 1457, 1460 (9th Cir.1985). "Claims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised." *Idaho Sporting Congress, Inc.,* 305 F.3d at 965.

▪▪▪ The Plaintiffs adequately raised the issue of elk hiding cover during the administrative process and have complied with the exhaustion requirement. Their administrative appeal states that the Forest Service did not comply with "forest plan standard for thermal and hiding cover for big game species." AR L7 at 59. In addition, a footnote to this statement specifically mentions the alleged violation of the 35% hiding cover requirement Plain-

tiffs have now raised before this Court. *Id.* at 59, n. 19. This was sufficient to put the Forest Service on notice of the claims regarding elk hiding cover.

### b. *Hiding cover standard*

 The Forest Plan requires that "elk summer range will be maintained at 35 percent or greater hiding cover." AR F176 at 25. The Forest Service defines hiding cover as "[a] timber stand which conceals 90% or more of a standing elk at 200 feet." *Id.* at 26. The Forest Plan also states that "[a]n environmental analysis for project work will include a cover analysis. The cover analysis should be done on a drainage or elk herd unit basis." *Id.* at 25. An elk herd unit is "[t]he total area used by a herd of elk in the course of one years [sic] movement from summer to winter range." *Id.* at 180.

 While the agency's calculation of hiding cover "need not be perfect," the Court "must still be able reasonably to ascertain from the record that the Forest Service is in compliance with the HNF Plan standard." *Native Ecosystems Council,* 418 F.3d at 963. The Forest Service must have a rational explanation for how it has calculated the hiding cover percentage. *Id.* at 964. "The hiding cover standard does not allow the Forest Service to exclude private and other non-HNF public lands within the ... elk herd's range from its hiding cover calculation perimeters." *Id.* at 962–63.

The Forest Service modeled hiding cover "using tree canopy and tree size attributes ... (40–70% tree canopy)" to determine whether the hiding cover standard was met. AR D104a at 1. The discussion of the method used does not mention the Forest Service definition of hiding cover, which requires timber to "conceal 90% or more of a standing elk at 200 feet." AR F176 at 26. However, the method does

seem to correlate with the definition used by the Montana FWP, which defines hiding cover as "[a] stand of coniferous trees having a crown closure of greater than 40%." AR F176 at 26.

The Forest Service analyzed compliance with the hiding cover standard in two ways. First, it examined hiding cover in the Greenhorn Elk Herd Unit. The boundaries of the Elk Herd Unit were developed in consultation with Montana FWP. AR H1 at 158. In determining compliance with the hiding cover standard based on the Greenhorn Elk Herd Unit, the EA "does not consider open road density." *Id.* at 188. The Forest Service also examined compliance with the standard based on the Greenhorn Elk Analysis Area, which was developed as part of the EA process. The Greenhorn Elk Analysis Area "incorporates land within the Helena National Forest boundary of the Greenhorn [Elk Herd Unit]." *Id.* at 158. In other words, it does not include private lands. Based on the hiding cover model described above, as applied to the Elk Herd Unit and Elk Analysis Area, the Forest Services concluded the hiding cover standard would be met, with 45% hiding cover in the Elk Herd Unit and 70% hiding cover in the Elk Analysis Area, after implementation of the proposed biathlon facility. AR H1 at 187, Table 3–14.

As in *Native Ecosystems Council,* the Court is not "able reasonably to ascertain from the record that the Forest Service is in compliance with the HNF Plan standard." 418 F.3d at 963. First, it seems the Forest Service has modeled hiding cover based on the Montana FWP method using canopy cover. There is no discussion either in the document describing the methodology or in the EA whether measuring canopy cover percentages, as required by the FWP definition of hiding cover, is synonymous with the Forest Ser-

vice definition of hiding cover. Consequently, it is impossible for the Court to determine whether the project will, in fact, comply with the Forest Service's elk hiding cover standard.

In addition, the analysis of hiding cover in the Elk Herd Unit and Elk Analysis Area do not demonstrate compliance with the standard. First, the Elk Analysis Area excludes private lands. AR H1 at 158. The Ninth Circuit has previously determined that it is a violation of NFMA to exclude private lands. *Native Ecosystems Council,* 418 F.3d at 962–63. Therefore, the Forest Service's conclusion that hiding cover will be met in the Elk Analysis Area is unsupportable on this record. The Forest Service seems to have committed a similar error as to the Elk Herd Unit by excluding roads, when it states, without any reasoning, that open roads are inapplicable to the hiding cover analysis in the Elk Herd Unit. AR H1 at 187. However, "[t]he hiding cover standard does not allow the Forest Service to exclude private and other non-HNF public lands within the ... elk herd's range from its hiding cover calculation perimeters." *Native Ecosystems Council,* 418 F.3d at 962–63. The Forest Service has not presented any rational explanation for its calculations, and the Court cannot determine whether the standard is met. *Id.* at 964.

During the NEPA process, agency personnel expressed concern about meeting the elk hiding cover standard. *E.g.* AR D102 at 2 (email noting the hiding cover standard will not be met "on a herd unit basis"); AR D105 at 4 ("There is a real good possibility we will not meet the hiding cover standard when we analyze at a herd unit level that includes all the lands

utilized by elk over the course of a year."). The agency seems to be engaged in numerical acrobatics in an effort to comply with the standard, despite its earlier recognition that the proposed facility would violate the standard. However, the methodology and conclusions are inconsistent with the Forest Plan and with *Native Ecosystems Council,* which means the Forest Service has violated NFMA as to the hiding cover standard.[2]

### 3. Moose standard for browse species

■ Next, Plaintiffs claim the EA fails to show the biathlon facility will comply with the Forest Plan standard for maintaining browse species that moose consume. The Forest Plan requires that "[m]oose habitat will be managed to provide adequate browse species diversity and quantity to support current moose populations." AR F176 at 27. Browse species include large saplings and aquatic vegetation, and in the winter, include species such as willow, alder, chokecherry, serviceberry and dogwood. AR D109a at 70.

The EA recognizes that moose are widely distributed throughout the project area and present in the area year-round. AR H1 at 161. The EA also acknowledges that some displacement of moose could occur, particularly during the winter, and asserts that individual moose would be affected, although the population as a whole is not expected to suffer. *Id.* at 188–89. The Wildlife Specialist's Report and the EA reasonably conclude that the biathlon facility will not impact browse species diversity. They note that, because this "is not a vegetation treatment project and the area of disturbance is small minimal impact upon riparian habitats, sapling size

---

2. Plaintiffs also claim the Forest Service failed to account for all the acreage that will be affected by the project. However, given the other deficiencies in the hiding cover

analysis, even if the Forest Service had properly counted the acreage, the Court would still be unable to ascertain if the standard is met.

conifers, or vegetative diversity," browse species diversity will not be impacted. AR D109a at 73; AR H1 at 188. *See also* AR H1 at 46 (detailing number of acres affected). The reasoning provided is brief, but it is sufficient to support the decision that the biathlon facility will not affect browse species diversity. The EA adequately addressed browse species diversity, and the conclusion that the standard will be met is not arbitrary and capricious.

### 4. Lynx standard

■ Plaintiffs also contend the EA does not demonstrate the biathlon facility will comply with the Forest Plan standard for lynx habitat connectivity. The standard requires that "[n]ew or expanded permanent development and vegetation management projects must maintain habitat connectivity in an LAU [lynx analysis unit] and/or linkage area." AR F193a at 57. The proposed facility is located entirely within a lynx analysis unit in potential lynx habitat, as defined by the interagency Canada Lynx Conservation Assessment and Strategy. AR H1 at 143; AR D109a at 39.

Plaintiffs suggest there is little to no analysis as to how the standard will be met and claim the record does not support the Forest Service's rationale in the FONSI that there is little lynx activity in the area. The Forest Service responds that the Biological Assessment and Wildlife Specialist's Report thoroughly analyze the issue and conclude that there will be no adverse impacts on lynx. They also rely on the rationale set forth in the FONSI that lynx use of the area may be low. AR H2 at 10.

The Forest Service's own documents show that the project may impact habitat connectivity, and the standard is not met. At one point, the Biological Assessment articulates that connectivity will be maintained under the preferred alternative be-cause only a small amount of habitat will become unsuitable and there will be only minimal changes. AR D96a at 28. Nonetheless, the Biological Assessment ultimately concludes that the habitat connectivity standard will not be met: "The proposed project is in compliance with [applicable] standards and guidelines ... *with the exception that project activities may detract from future linkage habitat potential,* but not preclude lynx movement." D96a at 35 (emphasis added). Throughout the discussion of lynx habitat, the agency repeatedly admits that the project is located within possible lynx habitat, and there may be some diminution of linkage potential because of the biathlon facility. *E.g.* AR H1 at 196; AR D109a at 43–45; AR D96a at 27, 33, 35.

The agency's argument that lynx usage of the area may be low is irrelevant regarding compliance with the habitat connectivity standard. The project is located within a lynx analysis unit. AR H1 at 143. The standard applies, and connectivity must be maintained regardless of whether lynx are currently residing in the area.

In its brief, the Forest Service admits that there will be "diminution of linkage potential under Alternative 3," but it "should neither prevent use of the area nor preclude movement of lynx." Def's Br. at 31 (citing AR D109a at 45). Again, this overlooks the basic requirement of the standard, which requires the agency to maintain current habitat connectivity, not to allow degradation of connectivity, so long as the project does not prevent all use by lynx. The Forest Service's own assessment of the proposed biathlon facility shows the project will not comply with the standard regarding lynx habitat connectivity. Therefore, on this question, the agency has violated NFMA.

## C. Consultation requirement in Section 7 of the ESA

Section 7 of the ESA requires agencies to consult with the U.S. Fish and Wildlife Service to insure federal action is "not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). The Forest Service may conduct an informal consultation to determine if a formal consultation is needed. If the Forest Service determines, with the concurrence of the Fish and Wildlife Service, that a proposed action is not likely to adversely affect a threatened or endangered species, no formal consultation is required. 50 C.F.R. § 402.13(a). In this case, the Forest Service conducted an informal consultation with the Fish and Wildlife Service as to threatened or endangered species affected by the proposed biathlon facility. The agency determined, and the Fish and Wildlife Service concurred, that the project was not likely to adversely affect any listed species, including the Canada lynx. AR F193 at 35; AR D97.

The Plaintiffs argue the determination violated the ESA because it relied on an inaccurate assumption that the project will not increase groomed or designated over-the-snow routes. The Canada Lynx Conservation Assessment and Strategy sets forth the following standard: "On federal lands in lynx habitat, allow no net increase in groomed or designated over-the-snow routes and snowmobile play areas by [lynx analysis unit]." AR F136 at 99. A designated over-the-snow route is a route that is "managed under permit or agreement or by the agency, where use is encouraged, either by on-the-ground marking or by publication in brochures, recreation opportunity guides or map . . . or in electronic

media produced or approved by the agency. . . . [G]roomed routes also are designated by definition." AR F193a at 66.

The Forest Service concluded that under Alternative 2, the project would be likely to adversely affect the lynx because there would be an increase in groomed or designated over-the-snow routes. Alternative 3 changes one aspect of the project to reach a finding that the project is not likely to adversely affect the lynx: the Forest Service argues it will actually decrease groomed and designated over-the-snow routes by altering management of Forest Service Route #1802,[3] as well as some adjacent ski trails. AR H1 at 45, 48. Plaintiffs take the position that Route #1802 will be used in such a way that it will continue to be a groomed or designated over-the-snow route.

Currently, Route #1802 is closed to motorized vehicle use December 2 through May 15, but the Forest Service allows limited motorized access through issuance of Travel Closure Permits. AR H1 at 77. On average, there are six to ten motorized trips per winter on snow machines. The permits "prohibit plowing except in an extraordinary situation." *Id.* Under Alternative 3, the Forest Service proposes to decrease groomed or a designated over-the-snow routes by changing its management of Route #1802. The agency contends the changes will meet the standard because the Forest Service will no longer groom the route, show or describe it on maps or plans, or sign it as part of the trail system. Def.'s Br. at 33 (quoting AR G25 at 5). The Forest Service will continue to issue permits for occasional use of Route #1802. AR F191 at 2–3; AR D109a at 113. Route #1802 lies adjacent to ski

**3.** In the record, Route #1802 is sometimes referred to as Microwave Road. *See* AR H1 at 77.

trails that are groomed and that will continue to be groomed after construction of the biathlon facility. AR H1 at 45.

■ The Forest Service did not err in completing the consultation process required by Section 7 of the ESA. It has advanced a reasonable interpretation of the standard regarding designated over-the-snow routes which is entitled to deference. *Native Ecosystems Council*, 418 F.3d at 960. The interpretation and application of the standard here is consistent with the definition of designated over-the-snow routes set forth by the agency because the route will no longer be marked or promoted by the agency as an available route. AR F193 a at 66 (defining designated over-the-snow routes). Further, nothing in the standard prohibits all over-the-snow use, such as occasional use of Route # 1802 by the permittees, and no grooming or plowing will occur "except in an extraordinary situation." AR H1 at 77.

While it seems the agency has technically complied with the standard, the Plaintiffs have also made a compelling argument that management of Route # 1802 will continue largely the same as it is now. As the comments by Montana FWP note, it appears that the Forest Service may be attempting to circumvent the standard. *See* AR J46 at 13. The use by permittees will not change because the road is already closed from December through May, and will continue to be restricted in the same way. The only change is that Route # 1802 will no longer be on maps or signs, but the use of the road will not actually decrease. In addition, there will still be groomed trails adjacent to Route # 1802, so the area will remain accessible for human use, but there will also be additional use on other routes newly created by the project. The Forest Service proposal regarding Route # 1802 narrowly complies with the standard.

## V. CONCLUSION

Therefore, IT IS HEREBY ORDERED that Plaintiffs' motion for summary judgment (dkt # 12) is GRANTED IN PART and DENIED IN PART. It is granted as to Counts I and II for wetlands, possible impacts on wildlife habitat connectivity, the cumulative impacts analysis, and the statement of reasons in support of the FONSI, Count IV (elk standard), and Count VI (lynx standard). It is denied in all other respects.

IT IS FURTHER ORDERED that Defendants' motion for summary judgment (dkt # 17) is GRANTED IN PART and DENIED IN PART. It is granted as to Counts I and II for consideration of listed species and critical habitat and consideration of Lewis and Clark County Resolution 2008–57, Count III (soil quality standards), Count V (moose standard for browse species diversity), and Count VII (ESA consultation requirement). It is denied in all other respects.

IT IS FURTHER ORDERED that Defendants are ENJOINED from commencing construction of the biathlon training facility, and the matter is REMANDED to the Forest Service to prepare an EIS.

The Clerk of Court is directed to (1) enter judgment in favor of Plaintiffs and against Defendants on Counts I and II as to wetlands, possible impacts on wildlife habitat connectivity, the cumulative impacts analysis, and the statement of reasons in support of the FONSI, Counts IV, and VI of Plaintiffs' Complaint; (2) enter judgment against Plaintiffs and in favor of Defendants as to the remaining Counts of Plaintiffs' Complaint; and (3) close this case.

The Court retains jurisdiction over the injunction granted in this case.